UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
PAUL-ERICK SAINT JEAN,

                                    Plaintiff,              **MEMORANDUM AND**
                                                           **ORDER**
                    -against-                              CV 08-4885 (ARL)

ACME BUS CORP. and BAUMANN &
SONS BUSES, INC.,

                                    Defendants.
--------------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

        Plaintiff Paul-Erick Saint Jean ("plaintiff") commenced this employment discrimination

action against defendants Acme Bus Corp. and Baumann & Sons Buses, Inc. ("defendants" or the

"Company") alleging discrimination and retaliation in violation of Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") on the basis of race, color and

national origin.  The parties have consented to the undersigned's jurisdiction pursuant to 28

U.S.C. § 636.  Before the court is defendants' motion for summary judgment pursuant to Federal

Rule of Civil Procedure ("Rule") 56.  For the reasons set forth below, defendants' motion is

granted.

                                    **BACKGROUND**

**A.      Factual Background**

        Defendants provide transportation services to schools and other private customers

throughout the region, including Long Island, Westchester and Connecticut.  (Defs.' 56.1 Stmt. ¶

9.)[1]  Defendants hired plaintiff, a black, Haitian male, on May 11, 2006 as a bus driver working

_____

        [1]The material facts, drawn from the Complaint (including the complaints filed with the
New York State Division of Human Rights ("DHR")) and the parties' Local Civil Rule 56.1

out of the Company's Copiague terminal.  (*Id.* at ¶ 10.)  At the time of his employment, plaintiff

received a copy of the Company's Employee Handbook.  (*Id.* at ¶ 42.)  In June 2006, plaintiff

was transferred to the Company's Farmingdale terminal, which operates both van and bus

services exclusively for the Association for the Help of Retarded Children of Nassau County

("AHRC").  (*Id.* at ¶¶ 10-11.)  When plaintiff was first transferred to the Farmingdale facility, he

was assigned to drive a van during the week and performed bus driving services for the Company

on the weekends.  (*Id.* at ¶ 13.)  From June 2006 until August 2007, plaintiff received the then-

current hourly rate paid to bus drivers for all of his services.  (*Id.* at ¶ 14.)

In August 2007, as a result of a reorganization by AHRC, the Company's exclusive

customer at the Farmingdale terminal, all of the bus and van routes in Farmingdale had to be

changed.[2]  (*Id.* at ¶ 15.)  At that time, the Company determined that it would hold a "pick of

routes" in order to assign new routes to its drivers, and at a meeting held by the Farmingdale

_____

("Rule 56.1") Statements, are construed in the light most favorable to plaintiff, the non-moving
party, except as otherwise noted.  *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d
Cir. 2005).  Plaintiff's Rule 56.1 Counter-Statements contest many of the facts in the defendants'
Rule 56.1 Statement but contain no citations to evidence in the record to support the controverted
statement of fact.  In addition, many of plaintiff's response paragraphs consist of "conclusory
allegations, speculation or conjecture."  *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.
1996).  Under Local Rule 56.1(d), each statement controverting any statement of material fact
must be followed by a citation to the evidence which would be admissible, as set forth and
required by Fed. R. Civ. P. 56(c).  *See* Local Civil Rule 56.1(d); *see also* Individual Practices of
Magistrate Judge Arlene L. Lindsay, § D(1); *see also Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74
(2d Cir. 2001) (explaining that where, as here, there are no citations to admissible evidence, or
the cited materials do not support the purported undisputed facts in a party's Rule 56.1 statement,
those assertions must be disregarded).  Accordingly, the court has set forth only those facts that
are supported by admissible evidence and not controverted by the record.  *See Aisin Seiki Co. v.
Union Pacific R. Co.*, 236 F. Supp. 2d 343, 345 n.1 (S.D.N.Y. 2002).  Where challenged the
court will address the admissibility of the evidence relied upon.

[2]As a result, the scope of the transportation services provided by the Company to AHRC
became primarily van service.  (*Lawrence Decl.*, dated February 2, 2011, ¶ 4.)

Terminal Manager, Barbara Lawrence, the Company announced a change in its pay policy concerning the hourly rates paid to drivers for the type of services performed on these routes. (*Id.* at ¶¶ 15-16.)   According to the policy, the Company would pay all regular drivers assigned to a regular route at the Farmingdale terminal the rate of pay applicable to the type of service they performed (bus or van), regardless of the type of license held by the employee.  (*Id.*)   Under this practice, a bus driver would earn a higher per hour rate than a van driver.  (Compl. at 11.)

In addition to regular full-time and part-time drivers, the Company hired drivers to be on "stand-by" or "spare" drivers, available to cover regular drivers' routes when they were out of work due to illness or vacation, who were guaranteed a limited number of hours of work each day and were paid based upon the type of their license, regardless of whether they drove a bus or a van.  (Defs.' 56.1 Stmt. ¶ 17.)  The Company also hired "casual" drivers, who were not guaranteed any hours of work, only appear for stand-by work on a part-time basis as needed, and were paid an hourly rate based upon the type of their license.  (*Id.* at ¶ 18.)

The Farmingdale terminal conducted a "pick of routes" based on seniority, with each driver's rank determined by the date the individual began working on a regular route (whether van or bus) with both morning and afternoon hours.  (*Id.* at ¶ 19.)  Plaintiff's seniority date was determined to be June 12, 2006.  (*Id.*)   Out of twelve total bus drivers, ten drivers were more senior than plaintiff.  (*Id.* at ¶ 20.)  In addition to plaintiff, the drivers included in the pick of routes at the Farmingdale terminal consisted of two African American drivers, four Haitian drivers and five Caucasian drivers. (*Id.*)  Seven regular bus routes were available for the "pick," and the remaining bus drivers were either assigned to van routes or given "stand-by" or "casual" work.  (*Id.*)  Plaintiff chose not to participate in the pick of the routes in August 2007.  (*Id.* ¶ 21.)

In early September 2007, plaintiff was offered work as a van driver and assumed a position as a van driver at the van hourly rate of pay on one of the routes that remained after the other drivers picked their routes.  (*Id.* at ¶¶ 22-23.)

On December 12, 2007, plaintiff filed an administrative complaint of employment discrimination with the New York State Division of Human Rights ("DHR") alleging that the pay practices at the Company's Farmingdale terminal were discriminatory in violation of Article 15 of the New York State Executive Law.  (*Id.* ¶¶ 2-3.)   The DHR conducted an investigation into the charges and, finding no probable cause for plaintiff's claim of discrimination, dismissed the complaint.  (*Id.* at ¶ 8.)

The Company offered plaintiff a regular bus route, and in January 2008 he assumed this new position and earned the hourly rate paid to bus drivers.  (*Id*. at ¶¶ 24-26.)   The matron assigned to this bus route was Margaret Robinson, an African-American employee.  (*Id.*)   On March 3, 2008, there was an incident on the bus between Robinson and plaintiff which involved an exchange of words between them when plaintiff asked Robinson to sit in the back of the bus if she wanted to open the windows.  (Compl. at 20.)   Robinson objected to this and reported the incident to their dispatcher,  plaintiff then asked the dispatcher to contact their supervisor Lawrence, and when plaintiff returned to the dispatcher office, Lawrence met with both Robinson and plaintiff to resolve the matter.  (*Id*.; Defs.' 56.1 Stmts. ¶ 34.)   Although plaintiff was offended by the manner in which his supervisor addressed him during the meeting, (Compl. at 21), neither employee was disciplined as a result of the meeting.  (Defs.' 56.1 Stmts. ¶ 35.)

On March 31, 2008, plaintiff filed a second administrative complaint with the DHR charging defendants with unlawful discrimination and retaliation and claiming that his

assignment to work with Robinson was in retaliation for his first DHR complaint on the basis of race and national origin discrimination. (*Id.* ¶¶ 4-5.) Plaintiff asserted this assignment was intended to harass him in violation of Article 15 of the New York State Executive Law. (*Id.*) Following an investigation into the charges, the DHR dismissed the second complaint. (*Id.* at ¶ 8.)

On May 7, 2008, an confrontation between plaintiff and Robinson broke out while plaintiff was driving AHRC passengers during their morning route. (*Id.* at ¶ 36.) AHRC received complaints from some of their passengers about the incident on the bus and contacted Barbara Lawrence to remove plaintiff and Robinson from service for AHRC pending an investigation. (*Id.* at ¶ 37.) The Company suspended both employees pending the results of the investigation. (*Id.*; Pl.'s Third DHR Compl.) The following day, Lisa Shortell, Quality Assurance Administrator for AHRC, interviewed plaintiff and Robinson. (Defs.' 56.1 Stmts. ¶ 38.) On May 8, 2008, plaintiff returned to AHRC on his own and spoke to Lisa Shortell about the investigation. (*Id.* ¶ 39.)

On May 9, 2008, AHRC determined that based on their conduct, neither plaintiff nor Robinson should be permitted to service any AHRC routes. (*Lawrence Decl.*, dated February 2, 2011, ¶ 19.) Plaintiff visited the Defendants' Human Resources Department on May 13, 2008 to inquire about the status of his employment. (Defs.' 56.1 Stmts. ¶ 41.) The Company's Human Resources Coordinator, Maureen Ouellette, warned plaintiff that he had violated the Company's policy against communications with a customer when he went directly to AHRC to inquire about the status of the investigation and was told that he was on suspension until further notice. (*Id.*) Despite the warning, plaintiff returned a second time to AHRC to inquire about the status of the

investigation.  (*Id.* at ¶ 43.)  Defendants terminated plaintiff's employment on May 19, 2008 for

his violation of the Company's policy prohibiting communications with Defendants' customer

AHRC.  (*Id.* at ¶ 44.)

On June 2, 2008, plaintiff filed a third administrative complaint with the DHR alleging

that the Company's suspension of his employment on May 7, 2008 and the termination of his

employment on May 19, 2008 were the result of unlawful discrimination and retaliation on the

basis of race, color and national origin based on his previous  complaints to the DHR in violation

of Article 15 of the New York State Executive Law.  (*Id.* ¶¶ 6-7.)  Following an investigation

into the charges, the DHR dismissed the complaint.  (*Id.* at ¶ 8.)

**B.      Procedural History**

Plaintiff commenced the instant action *pro se* on December 4, 2008, alleging that

defendants (1) discriminated against him based on his race (Black) and color (Black) (hereinafter

referred to collectively as "race") and national origin (Haitian) by reducing his hourly rate of pay

shortly after his hiring in violation of Title VII and  (2) retaliated against him based on his race

and Haitian national origin in violation of Title VII by suspending plaintiff's employment on

May 7, 2008 and terminating his employment on May 19, 2008.  Attorney Kristina S. Heuser

filed a notice of appearance on behalf of plaintiff on August 3, 2010.  By letter application dated

September 14, 2010, plaintiff's counsel moved for an extension of time to complete discovery,

and the deadlines set forth in the scheduling order were extended sixty days.  By application

dated November 11, 2010, plaintiff's counsel again requested a sixty-day extension of the

discovery deadlines, which was granted.  At the final conference held before the undersigned on

March 3, 2011, all discovery was deemed complete,  the joint proposed pretrial order was

accepted for filing, and the case was returned to the district judge for final disposition. On June

2, 2011, the parties consented to the undersigned's jurisdiction.

Defendants now move for summary judgment pursuant to Federal Rule of Civil

Procedure 56.

## DISCUSSION

## I.     Applicable Law and Legal Standards

### A.     Summary Judgment

Summary judgment is proper only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine if 'the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might

affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31,

35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In

determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying

affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most

favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d

Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam));

*Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with

'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)). The nonmoving

party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted). However, "the judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

In deciding an employment discrimination case, the Court of Appeals for the Second Circuit has cautioned that "intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citations and internal quotation marks omitted). At the same time, the Court held that "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *Id.* "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

### B.      McDonnell-Douglas Burden-Shifting Framework

In an employment discrimination case such as this, where there is no direct evidence of

discriminatory conduct, plaintiff's discrimination and retaliation claims brought under Title VII are analyzed under the now familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir. 2005); *Woodman v. WWOR-TV, Inc.,* 411 F.3d 69, 76 (2d Cir. 2005). Under *McDonnell Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non;" and, thus, (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that race discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

## II.     Evidentiary Challenge

As a threshold matter, plaintiff challenges the admissibility of the declarations submitted by (1) plaintiff's former supervisor, Barbara Lawrence, (2) the director of defendants' human resources department, Maureen Ouellette, and (3) matron Margaret Robinson, on the grounds that they are unsworn affidavits, not notarized and should therefore be considered inadmissible hearsay. (Pl. Mem. of Law in Opp. at 6, 11.) Fed. R. Civ. P. 56 provides that an affidavit submitted in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997) (citations omitted).

"To be admissible in a summary judgment proceeding, an affidavit must be sworn to before an officer authorized to administer oaths, such as a notary public." *Taylor & Fulton Packing, LLC v. Marco Int'l Foods, LLC*, No. 09-CV-2614, 2011 WL 6329194, at *4 n.2 (E.D.N.Y. Dec. 16, 2011) (citation omitted). In the alternative, "under 28 U.S.C. § 1746, a unsworn declaration made under penalty of perjury has the same evidentiary weight as an affidavit if it includes language in substantially the same form as 'I declare (or certify, verify, or state) that the foregoing is true and correct' followed by a signature and date of execution." (*Id.*) (citations omitted); *see LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (same). In each of her two declarations, Lawrence "declare[s] under penalty of perjury that the following is true and correct" and her signature and the date appear at the end of each document. (*Lawrence Decls.*, dated February 2, 2011 and dated February 14, 2012.) Lawrence's unsworn declarations, therefore, meet the requirements of Section 1746 and are admissible evidence that may be considered in ruling on the within motion. Likewise, the Declaration of Maureen Ouellette "declare[s] under penalty of perjury that the following is true and correct" and her signature and the date appear at the end of the document. (*Ouellette Decl.*, dated February 2, 2011.) Ouellette's unsworn declaration, therefore, meets the requirements of Section 1746 and is admissible evidence that may be considered in ruling on the within motion. Similarly, in her declaration, Robinson "declare[s] under penalty of perjury that the following is true and correct" and her signature and the date appear at the end of each document. (*Robinson*

10

*Decl.*, dated February 14, 2012.) Robinson's unsworn declaration, therefore, meets the requirements of Section 1746 and is admissible evidence that may be considered in ruling on the within motion. The court's review of the Lawrence declarations, Ouellette declaration and Robinson declaration reveals that each of the witnesses were competent to testify on the subject matter contained in each of the respective declarations.

Plaintiff next challenges the admissibility of the documents attached to the Declaration of Maureen Ouellette dated February 2, 2011 and the Declaration of Barbara Lawrence dated February 2, 2011 as exhibits on the grounds that the documents have not been authenticated and many of the exhibits contain hearsay. (Pl. Mem. of Law in Opp. at 6.) A review of the exhibits attached to these declarations indicates that the documents are copies of the Company's records in connection with plaintiff's employment with defendants, *viz.* (i) Payroll Status Change Form, dated October 12, 2006; (ii) Payroll Status Change Form, dated September 12, 2007; (iii) Handbook and Acknowledgment of Receipt of Handbook, dated May 10, 2006; (iv) Termination Report dated May 19, 2008; (v) Seniority List with Assignments as of September 2007; (vi) Payroll Status Change Form, dated January 15, 2008; (vii) Driver/Matron Incident Report Form, dated March 3, 2008; (viii) Employee Statement, dated March 6, 2008; (ix) Email Report of Ann Miller, dated May 9, 2008; and (x) Email from Lisa Shortell. (Ouellette Decl., dated February 2, 2011, Exs. A-D; Lawrence Decl., dated February 2, 2011, Exs. A-F.) Although a declarant may offer evidence in her declaration based on personal knowledge obtained from the contents of company records she reviewed in her official capacity, *see Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgt, Inc.*, No. 04-CV-2293 (JFB)(SMG), 2007 WL 74304, at *2 (E.D.N.Y. Jan. 8, 2007), with respect to the exhibits attached to the declarations at issue,

defendants fail to address or satisfy the authentication issue raised in plaintiff's opposition papers. To the extent that defendants would argue that these exhibits are admissible under the business records exception to the hearsay rule, neither Ouellette nor Lawrence state in their respective declarations that the documents at issue were prepared by the declarants or others in the ordinary course of business and that it was the ordinary business practice of the Company to prepare such records. *See* Fed. R. Evid. 803(6); *see also Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 2007 WL 74304, at *2 ("when offering business records in support of a motion for summary judgment, in order to avoid the bar against hearsay, the offering party should present an affidavit from a document custodian that explain[s] whether [the records] were kept in the ordinary course of business, although that person need not have personal knowledge of the actual creation of the document") (internal quotation marks and citation omitted); *United States v. Chang An-Lo*, 851 F.2d 547, 557 (2d Cir. 1988) (noting that "someone who is sufficiently familiar with the business practice must testify that [the] records were made as part of that practice"). Accordingly, the undersigned will not consider these exhibits on the motion for summary judgment.

Finally, plaintiff objects to plaintiff's deposition, held on May 20, 2010, on the grounds that defense counsel deposed plaintiff before he was assigned counsel and that no Haitian translator was provided to plaintiff during the deposition. Plaintiff's objections are unpersuasive. Plaintiff commenced this action *pro se*, on December 4, 2008, "representing himself, and as such, [wa]s duty-bound to participate in all phases of the litigation, including, as requested, presenting himself as a witness to be deposed." *Brockway v. Veterans Admin. Healthcare Sys.*, No. 3:10-CV-719 (CSH), 2011 WL 1459592, at *7 (D. Conn. Apr. 15, 2011). Defense counsel

had the right to depose plaintiff and inquire into the factual basis for his discrimination claims and thereby conduct discovery pursuant to Fed. R. Civ. P. 26(b). (*Id.*) With respect to plaintiff's second objection to his deposition, the court notes that "[i]n general, a *pro se* civil plaintiff is not entitled to an interpreter or translator. *Desulma v. Goolsby*, No. 98 CIV 2078 (RMB)(RLE), 1999 WL 147695, at *1 (S.D.N.Y. Mar,. 16, 1999). That being said, there is no evidence in the record that plaintiff objected to being deposed or that plaintiff requested a Haitian translator at his deposition. A review of the entire transcript of plaintiff's deposition further indicates that plaintiff understood the questions posed to him. Defense counsel confirms this attesting in her affirmation that "[a]t no time during the deposition did [p]laintiff indicate that he required the services of a translator, nor did he express any difficulty in understanding the questions I posed." (*Grath Aff.*, dated February 16, 2012, ¶ 5.) After the conclusion of plaintiff's deposition, defense counsel provided a copy of the transcript to plaintiff for him to review and correct, and to date, defense counsel has not received a corrected copy from plaintiff or his counsel. (*Id.*) Under these circumstances, plaintiff's objections fail, and his deposition is admissible evidence that may be considered in ruling on the motion for summary judgment.

### III. Plaintiff's Title VII Claims Against Defendants

Title VII prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). In addition, Title VII provides that it "shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful practice by this subchapter." *Id.* § 2000e-3(a). Plaintiff contends that defendants (1)

discriminated against him based on his race and national origin by reducing his pay in August 2007; and (2) retaliated against him based on his race and national origin by (i) suspending his employment on May 7, 2008 and (ii) terminating his employment on May 19, 2008 in violation of Title VII[3].

## A. Discrimination Based on Race, Color and National Origin

To establish a prima facie case of discrimination, a plaintiff must show that:

---

[3]To the extent that the complaint alleges a claim of a hostile work environment and a claim of retaliation based on plaintiff's assignment to a bus route with matron Robinson in January 2008, defendants seek summary judgment on these claims. In his opposition papers, however, plaintiff has failed to address or respond to defendants' arguments regarding a hostile work environment. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (citing *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases); *accord Santiago v. City of New York*, No. 05-CV-3668 (RRM)(VVP), 2009 WL 935720, at *11 n.19 (E.D.N.Y. Mar. 31, 2009) (finding First Amendment retaliation claim abandoned by virtue of plaintiff's failure to pursue such a claim in her opposition papers); *Sorto-Romero v. Delta Int'l Machinery Corp.*, No. 05-CV-5172 (SJF)(AKT), 2007 WL 2816191, at *9 (E.D.N.Y. Sept. 24, 2007) (finding claim "abandoned by virtue of his failure to address [it] in his memorandum responding to defendant['s] summary judgment motion"). Having failed to pursue a claim for a hostile work environment in his memorandum in opposition to the summary judgment motion, the court deems this claim abandoned and grants summary judgment in favor of the defendants as to this claim.

With respect to the retaliation claims, plaintiff states that plaintiff's suspension on May 7, 2008 was "the first retaliatory action taken by defendants," that plaintiff's termination on May 19, 2008 marked "the second retaliatory action complained of in this action," and concedes that the assignment of matron Robinson "in and of itself does not rise to the level of a violation of Title VII, though the filing of the [second DHR] complaint is additional protected activity that may have contributed to" plaintiff's retaliation claim. (Pl.'s Mem. in Opp. at 11-13 & n.4.) Notably, even assuming the alleged charges set forth in the second DHR complaint occurred, plaintiff did not suffer an adverse employment action and therefore could not have established a prima facie case of either discrimination or retaliation. Accordingly, the court grants defendants' motion for summary judgment with respect to Title VII claims made in connection with the second DHR complaint and will consider plaintiff's administrative complaint filed on March 31, 2008 only as it may constitute an underlying "protected activity" giving rise to plaintiff's retaliation claim. (*Id.* at 11 n.4.)

(1) he is a member of a protected class, (2) was qualified for the position he held, and

(3) suffered an adverse employment action (4) under circumstances giving rise to an inference of

discrimination. *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010); *see Forde v.*

*Donahoe,* No. 10-CV-2445 (CBA)(LB), 2012 WL 1020038, at *6 (E.D.N.Y. Mar. 26, 2012).   In

the instant matter, defendants do not dispute that plaintiff, a black, Haitian male, belongs to a

protected class.   Nor does the Company dispute that plaintiff was qualified for his position or

suffered an adverse employment action when defendants reduced his hourly rate of pay.

Defendants do, however, argue that plaintiff has failed to establish that the circumstances

surrounding his reduction in pay gave rise to discrimination based on his race or national origin.

Discriminatory intent, therefore, is "the critical issue." *Watson v. Fort Worth Bank & Trust*, 487

U.S. 977, 986 (1988).   Accordingly, plaintiff must present sufficient evidence to enable a rational

trier of fact to find that his reduction in pay was based on his race and/or national origin.

Plaintiff asserts that the circumstances surrounding his reduction in pay give rise to an

inference of discrimination:

> Plaintiff was hired to drive a bus and paid the hourly rate given to bus drivers
> even though there was no bus route available for him to drive since the time of his
> hiring.  Approximately four (4) months after his hiring, plaintiff was given a
> demotion to a van driver and paid a lesser hourly wage.  Up until this occurred, it
> had been company policy for all employees to receive an hourly wage based upon
> the class of drivers' license they held.  At all relevant times, plaintiff held a CDL
> license. . . .
>
> The 'change in policy' regarding pay practices had the effect of negatively
> impacting only two employees, both of whom are black, Haitian men.  Further
> still, another employee who was hired after plaintiff (defendants claim the 'pick'
> of routes was done in order of seniority) and who is Caucasian man, Michael
> Labrys, was able to retain his bus-rate pay in spite of driving a van route.

(Pl.'s Mem. in Opp., at 4-5.)  Specifically, plaintiff argues an inference of discrimination can be

drawn based on (i) evidence that only black, Haitian employees were negatively affected by the Company's change in pay practices; and (ii) evidence that two similarly situated employees outside his protected class were treated more favorably than him, *viz.* did not receive a reduction in pay.

"A plaintiff can establish an inference of discrimination through direct evidence of discriminatory intent, or through circumstantial evidence demonstrating that the employer treated plaintiff less favorably than a similarly situated employee outside of his protected group." *Renaud v. Federal Exp. Corp.,* No. 10 CV 4261(LB), 2012 WL 34089, at *4 (E.D.N.Y. Jan. 6, 2012) (citations omitted); *see Holtz,* 258 F.3d at 77. Here, the record is devoid of any discriminatory animus, either direct or circumstantial.

First, plaintiff has failed to produce any direct evidence of discriminatory animus with respect to defendants' change in pay practice. The record evidence indicates that as a result of the reorganization and changes made by defendants' customer, AHRC, all of the transportation routes at the Farmingdale terminal changed in August 2007, with the majority of routes becoming van routes with fewer bus routes. This situation caused the Company to assign the driving routes for its bus and van drivers by seniority. At the time the "pick of routes" was conducted, the Company announced its policy that all drivers at the Farmingdale terminal would receive the rate of pay applicable to the type of service they performed, to wit, bus or van. The "pick" of transportation routes was conducted based on the seniority of the drivers. Although plaintiff takes issue with the fact that the Company determined the employees' seniority date based on the date the driver first began driving both a morning and afternoon route, plaintiff has not proffered any evidence that this determination was made in an effort to discriminate against

any individual or class of individuals. Plaintiff acknowledges that he did not receive a regular assignment when he was first hired by the Company in May 2006, and defendants determined his seniority date was June 12, 2006, the date he first started working at the Farmingdale terminal on both a morning and afternoon route.

Moreover, a discriminatory animus cannot be inferred based on plaintiff's argument that the change in policy and pick of routes were designed to negatively affect only black or Haitian employees. The record shows that in addition to plaintiff, there were four other Haitian bus drivers at Farmingdale, two African-American drivers and five Caucasian drivers who participated in the "pick of routes." (*Lawrence Decl*., dated February 12, 2011, ¶ 12.) Ten of the eleven bus drivers had greater seniority status than plaintiff, with one driver, Camiliar Jacques (Haitian) with less seniority. (*Id.*) Seven regular bus routes were available for the "pick," with the remaining bus drivers being assigned to regular van routes or given "stand-by" or "casual" routes. (*Id.*) Following the reassignments, there were black, Haitian drivers who continued to receive bus pay after the August 2007 change. For example, Coster Ferjuste, a black, Haitian driver, received a bus route based on his seniority and continued to receive the bus rate of pay at the Farmingdale terminal after the August 2007 change. (*Lawrence Decl*., dated February 14, 2012, ¶ 8.) In addition, two other black, Haitian employees, Rolguy Sainbert and Pierre Joseph, continued to receive the bus rate of pay, despite not having been assigned to a regular bus route, by virtue of their employment status with the Company as "stand by" or "spare" drivers.[4] (*Id.* at

---

[4]Plaintiff asserts in conclusory fashion that the category of "stand-by" or "spare" driver was a "ruse" created by defendants for the purpose of defending against this litigation and the Company's discriminatory pay practices. Plaintiff's theory, without any factual support or evidence, that defendants evaded their pay policy by employing Caucasian drivers on van routes, labeling them "stand-by" drivers and paying the bus pay of rate is unavailing. *See Hicks v.*

¶ 3.)

Finally, plaintiff's allegations that a discriminatory animus can be inferred from disparate treatment is unsupported by the record evidence. The record shows that the change in pay policy affected not only plaintiff, but also other employees outside his protected class. Following the reorganization of the Company's customer AHRC, defendants' pay policy change resulted in certain non-black and non-Haitian individuals being reassigned to van routes with a concomitant reduction in their hourly pay as a result of their reassignment, to wit, Mauricio Gil (Latin American), Joseph Carey (Caucasian), and Andrew DePaolo (Caucasian). (*Id*. at ¶ 3.)

Nevertheless, without providing any details or citations to the record, plaintiff identifies two Caucasian employees, Michael Labrys[5] and Mary who he alleges were similarly situated to

---

*Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment"). Contrary to plaintiff's position, there is record evidence that the category of "stand-by" drivers was not a newly created category of drivers at the Company. Plaintiff testified at his deposition that when he had worked as a "stand-by" driver on Saturdays he had been guaranteed five hours of work, and when he was first transferred to the Farmingdale terminal because he had requested more hours, he worked for a week as a "stand-by" driver before being given a regular route. (*Grath Aff.*, dated February 16, 2012, Ex. A, at 21-23, 38.) Notably, plaintiff also referred to the category of "stand-by drivers" in his first DHR complaint. (Compl. at 11.) In addition, there is ample evidence in the record which establishes the Company's employment of drivers in this classification. (*Lawrence Decl.*, dated February 2, 2011, at ¶ 6; *Lawrence Decl.*, dated February 14, 2012, at ¶ 3.)

[5]Plaintiff fails to adduce any evidence to support his claim that Labrys was hired after him. (Pl.'s Mem. in Opp., at 5, 9.) Plaintiff merely states "upon information and belief, Michael Labrys was hired after plaintiff." (*Id*. at 9.) Plaintiff's assertion, without more, is insufficient to establish an inference of discrimination sufficient to support a claim of discrimination. *See Desir v. Board of Co-op Educ. Servs. (BOCES) Nassau County*, 803 F. Supp. 2d 168, 181 (E.D.N.Y. 2011) ("a plaintiff's naked assertion against sworn testimony does not raise a genuine issue of material fact; rather it pits sworn testimony against speculation, conjecture and self-serving conclusions") (internal quotation marks and citations omitted); *see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (only evidence that "allows for a reasonable inference of discrimination," not merely that which "gives rise to speculation and conjecture" fulfills

him and did not suffer a reduction in their pay rate after the August 2007 policy change. (Pl.'s 56.1 Stmt. at ¶ 28.) In addition, plaintiff contends generally that "[t]here are likely other employees, but plaintiff is not in a position to know the names of all employees and what rate-of-pay they were compensated at." (*Id.*) To establish an inference of discrimination by comparing himself to other similarly situated employees, plaintiff must demonstrate that the Company "subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citation omitted); *see Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("[a] showing of disparate treatment – that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group – is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case") (internal quotation marks and citation omitted). An employee may be considered similarly situated to a co-employee if he was (1) "subject to the same performance evaluation and discipline standards," and (2) "engaged in comparable conduct." *Graham*, 230 F.3d at 30. "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than showing that both cases are identical." *Id.* Thus, in order to establish an inference of discriminatory animus, plaintiff must show that he was treated differently than individuals "similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997); *see Ruiz*, 609 F.3d at 494. Plaintiff's allegations fall far short of this standard.

A review of the record shows that unlike plaintiff, Labrys was retained by the Company

---

plaintiff's burden).

as a bus driver on a "casual" basis, did not have a regular transportation route, worked a morning only run (due to other work commitments) and when he was available for other work in the afternoons, he worked on stand-by and drove a van or bus as needed. (*Lawrence Decl.*, dated February 14, 2012, ¶ 4.) Based on the nature of his employment classification, Labarys continued to receive bus pay after the August 2007 pick. Likewise, Mary (Romano) was retained by the Company as a stand-by driver without a regular transportation route and continued to receive bus pay. Given the employment status of these two employees and the facts that neither employee had a regular route but could be called upon at any time to cover a bus route or van route depending on the Company's needs, neither Labarys nor Mike can be considered similarly situated in all material respects. *Goldman v. Admin. for Children's Servs.,* No. 04 Civ. 7890(GEL), 2007 WL 1552397, at *7 (S.D.N.Y. May 29, 2007) (plaintiff must at least "provide an objectively identifiable basis for comparability between him[self] and other employees") (internal quotation marks and citation omitted). Additionally, plaintiff's conclusory statement that there were "likely other employees" outside his protected class that were treated more favorably than he without more is insufficient to make out a prima facie case of discrimination on the basis of race or national origin. *See Desir*, 803 F. Supp. 2d at 181 ("[c]onclusory statements that similarly situated employees outside the protected class were treated more favorably are insufficient to defeat summary judgment") (internal quotation marks and citations omitted); *see also Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) ("[t]he nonmovant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture"). Thus, having failed to show a "reasonably close resemblance of the facts and

circumstances of plaintiff's and comparator's cases," plaintiff fails to establish an inference of discrimination based on race or national based on disparate treatment. *Ruiz*, 609 F.3d at 494.

In summary, plaintiff has not produced any evidentiary proof in admissible form sufficient to allow a reasonable juror to conclude that the circumstances surrounding plaintiff's decrease in pay in August 2007 gave rise to an inference of discrimination based on his race or national origin. The court concludes that summary judgment is appropriate on plaintiff's discrimination claim because plaintiff has failed to make out a prima facie case. Accordingly, defendants' motion for summary judgment on plaintiff's discrimination claim is granted.

### B.    Retaliation Based on Race and National Origin

To establish a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant[s] knew of the protected activity; (3) an adverse employment action, and (4) that there was a casual connection between the protected activity and the adverse employment action." *Hicks,* 593 F.3d at 164 (internal quotation marks and citations omitted). Plaintiff's burden in establishing these elements is *de minimis*. *See, e.g., Woodman v. WWOR-TV,* 411 F.3d 69, 76 (2d Cir. 2005). In evaluating whether this initial burden has been met, the court's role "is to determine only whether the proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If this initial burden is met, "a presumption of retaliation arises," and the burden shifts to "the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Hicks*, 593 F.3d at 166. If the employer produces evidence of a non-retaliatory justification for the adverse employment action, then the employee must, in order to avoid summary judgment, "show that retaliation was a substantial

reason for the adverse employment action" or that the proffered legitimate, non-retaliatory reason was pretextual.  *Id.*

**(1)     Prima Facie Case**

Although defendants contend that plaintiff cannot satisfy any of the elements required to establish a prima facie case of retaliation, the court finds he has satisfied his minimal burden.

**(a)     Participation in Protected Activity Known to the Employer**

"An employee engages in protected activity when [he] complains of an employment practice that [he] reasonably believes violates the law."  *Mayers v. Emigrant Bancorp, Inc.,* 796 F. Supp. 2d 434, 448 (S.D.N.Y. 2011); *see Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir. 2000) ("The term protected activity refers to action taken to protest or oppose statutorily prohibited discrimination).  To constitute protected activity, the employer must have "understood, or could reasonably have understood, that the plaintiff's [complaint] was directed at *conduct prohibited by Title VII*."  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (emphasis in original) (internal quotation marks and citation omitted); *see Mayers,* 796 F. Supp. 2d at 448 ("In order for a complaint to form the basis of a retaliation claim . . . the employer must have understood, or reasonably understood that the plaintiff's opposition was directed at conduct prohibited by the employment discrimination laws") (internal quotation marks and citations omitted).  "Participation in protected activity includes expressing opposition to employment practices unlawful under Title VII. . . . [A] plaintiff alleging retaliation need only have a reasonable, good faith belief that the employment practice complained of is unlawful."  *Swift v. Countrywide Home Loans, Inc.*, 770 F. Supp. 2d 483, 489 (E.D.N.Y. 2011) (internal

quotation marks and citation omitted). Moreover, it is well settled in the Second Circuit that mere "general corporate knowledge" that plaintiff had engaged in a protected activity satisfies the knowledge requirement. *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000). Indeed, "[e]ven if the agents who carried out the adverse action did not know about the plaintiff's protected activity the knowledge requirement is met if the legal entity was on notice." *Papelino v. Albany Coll. of Pharmacy of Union Univ.,* 633 F.3d 81, 92 (2d Cir. 2011) (internal quotation marks and citation omitted).

The court finds that plaintiff participated in protected activity when he filed an administrative complaint with the New York State Division of Human Rights against the Company in December 2007 and March 2008 charging the Company with unlawful discrimination on the basis of race and nation origin discrimination. (*Grath Aff.,* dated February 2, 2011, Exs. B, C.) The Company was given an opportunity to respond to the complaints, provided information and evidence to the New York State Division of Human Rights for its investigation, and therefore was on notice that plaintiff engaged in protected activity. (*Grath Aff.,* dated February 2, 2011, Exs. E, F.) Thus, plaintiff has satisfied the first two elements.

### (b)    Adverse Employment Action

"The standard for what constitutes an adverse action in a retaliation claim is different and less demanding than in a disparate treatment claim." *Forde*, 2012 WL 1020038, at *10; *see Thompson v. North American Stainless, LP,* 131 S. Ct. 863, 868 (2011); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) ("the antiretaliation provision, unlike the substantive provision, is not limited to discrimatory actions that affect the terms and conditions of employment"). To establish an adverse employment action, a plaintiff must demonstrate that "a

23

reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (internal quotation marks and citation omitted). "An adverse employment action is one that inflicts significant rather than a trivial harm, which would be likely to deter victims of discrimination from complaining to the [NYSDHR], the courts, and their employers." *Ballard v. Children's Aid Society*, 781 F. Supp. 2d 198, 207 (S.D.N.Y. 2011) (internal quotation marks and citations omitted).

Under this standard, the court finds that plaintiff's suspension of employment without pay on May 7, 2008 and termination on May 19, 2008 constitute adverse employment actions. A suspension from employment without pay pending an investigation could well dissuade a reasonable worker from making or supporting a charge of discrimination. *See White*, 548 U.S. at 72-73 ("A reasonable employee facing the choice between retaining her job [and paycheck] and filing a discrimination complaint might well choose the former. That is to say, an indefinite suspension without pay could well act as a deterrent even if the suspended employee eventually received backpay") (alteration in original); *see also Lovejoy-Wilson v. NOCO Motor Fuel Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (even where plaintiff was later reimbursed, "suspension without pay is sufficient to constitute an adverse employment action"); *Morales v. NYS Dep't of Labor,* No. 5:06-cv-0899 (NAM/ATB), 2012 WL 1097318, at *17 (N.D.N.Y. Mar. 30, 2012) ("[t]here is no question that plaintiff's one-week suspension without pay qualifies as an adverse employment action"); *Chacko v. Connecticut,* No. 3:07-cv-1120(CFD), 2010 WL 1330861, at *15 (D. Conn. Mar. 30, 2010) ("[s]uspension is clearly an adverse employment action"). Moreover, termination of employment is clearly an adverse employment action. *See Galabya v New York City Bd. of*

*Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include a "termination in employment"); *Weisbecker v. Sayville Union Free Sch. Dist.*, No. 10-cv-4645 (JFB)(WDW), 2012 WL 3975049, at *13 (E.D.N.Y. Sept. 12, 2012) (noting that "[t]ypical adverse employment actions may include termination from a job"). Thus, plaintiff has satisfied the third element.

### (c) Causation

Plaintiff may show a causal connection either (1) "*indirectly*," by presenting evidence of temporal proximity between the protected activity and adverse action, or through other evidence such as different treatment of similarly situated employees, or (2) *directly* through evidence of retaliatory animus directed against plaintiff by the defendant[s]." *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir. 1987) (emphasis in original); *Gordon,* 232 F.3d at 117 (same). Here the record is devoid of any evidence of direct retaliatory animus. Plaintiff instead relies on indirect evidence of temporal proximity.

"[A] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.,* 252 F.3d 545, 554 (2d Cir. 2001) (internal quotation marks and citation omitted). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Id.* However, "courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Flood v. UBS Global Asset Mgmt.,* No. 10-cv-374, 2012 WL 288041, at *17 (S.D.N.Y. Feb. 1, 2012) (citation omitted); *see Beaumont v.*

*Cablevision Sys. Corp.*, No. 10-CV-3585 (JG)(SMG), 2012 WL 1158802, at *6 (E.D.N.Y. Apr. 9, 2012) (same) (collecting cases). The Second Circuit, on the other hand, has previously held that "five months is not to long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 111 (2d Cir. 2010); *Gorman-Bakos,* 252 F.3d at 555.

Here, plaintiff's most recent administrative complaint about race and national origin discrimination was filed on March 31, 2008. Plaintiff was suspended from his job on May 7, 2008 and terminated nearly two weeks later. There was a gap of approximately of five weeks to seven weeks between his complaints and any adverse actions. Thus, the temporal relationship is sufficient to satisfy plaintiff's burden of showing indirect causation. With this prong met, plaintiff has stated a prima facie case of retaliation. The burden now shifts to defendants to articulate a legitimate, non-discriminatory reason for plaintiff's suspension and termination.

### (2)     Defendants' Non-Retaliatory Reasons

Defendants have provided legitimate non-retaliatory reasons for the suspension of plaintiff's employment. The record shows that the Company suspended plaintiff's employment because its customer AHRC was launching an investigation into a confrontational incident that had occurred between plaintiff and Robinson while plaintiff was driving AHRC's clients during their morning route. (*Lawrence Decl.*, dated February 2, 2011, ¶¶ 17.) The evidence indicates that AHRC directed the Company to remove both Robinson and plaintiff from service for AHRC because AHRC had received complaints made by passengers on the bus that would require an investigation. (*Lawrence Decl.*, dated February 14, 2012, ¶ 9.) Because the Farmingdale terminal services only AHRC, and there was no other work for either plaintiff or Robinson, defendants removed both employees from service for the AHRC and suspended them pending the AHRC's investigation into complaints made by its clients. (*Id.* ¶¶ 9-10.) Thus the record shows that

defendants suspended plaintiff for legitimate business reasons (pending an investigation by the Company's customer into complaints of inappropriate conduct between two of its employees) and not for any discriminatory or retaliatory animus. *Cf. Nurse v. Lutheran Med. Ctr.*, No. 09-CV-5356(KAM)(RLM), 2012 WL 642847, at *17 (holding defendant established legitimate non-discriminatory reason for terminating plaintiff's employment where plaintiff was alleged to have engaged in unprofessional conduct as reported by coworkers, school administrators and a parent); *Papasmiris v. Dist. 20 of the N.Y.C. Dep't of Educ.*, 299 Fed. Appx. 97, 98 (2d 2008) (affirming district court's grant of summary judgment to defendants were the evidence of legitimate termination included letters from parents complaining that plaintiff had behaved inappropriately on a school trip).

Likewise, defendants state a legitimate non-discriminatory reason for plaintiff's termination, *viz.* that plaintiff was discharged for violating the Company's policy which prohibited employee contact with customers concerning Company business. (*Ouellette Decl.*, dated Feb. 2, 2011, ¶ 5.) It is undisputed that plaintiff was terminated for violating Policy 5(d) which expressly states: "Routes, Timing, Baumann business etc. . . [sic] are NEVER to be discussed with passengers, parents, school district employees, or any persons outside the Company." (Pl. Mem. in Opp. at 17.) This policy was communicated to employees in the Employee Handbook. (*Ouellette Decl.*, dated Feb. 2, 2011, ¶ 5.) It was the Company's practice to provide all new employees with a copy of the handbook at the time of their hire, and plaintiff received a copy of the handbook on May 10, 2006. (*Id.*) Despite plaintiff's counsel's assertion that the policy was not provided to plaintiff or his counsel, plaintiff received a copy of the Employee Handbook on May 10, 2006 and signed an acknowledgment of receipt of the handbook, and defendants produced the handbook in connection with defendants' Rule 26 disclosures as well as in response

to plaintiff's document demand on December 30, 2010. (*Id.*; *Grath Affirm.*, dated February 16, 2012, at ¶ 8.) The evidence shows that plaintiff was also made aware of the policy in May 2008, and specifically warned not to contact defendants' customer AHRC concerning its investigation of a dispute between plaintiff and Robinson. (*Ouellette Decl.*, dated Feb. 2, 2011, at ¶ 6.)

The record documents plaintiff's violation of defendants' workplace policy prohibiting employees from contacting a customer. Following plaintiff's suspension, plaintiff attended an investigatory meeting/interview on May 8, 2008 with Lisa Shortell, AHRC's Quality Assurance Administrator. (*Lawrence Decl.*, dated Feb. 2, 2011, ¶ 18.) After his interview, plaintiff returned to AHRC to discuss the incident with Shortell. (*Id.* at ¶ 20.) On May 13, 2008, defendants' Human Resources Manager Ouellette spoke with plaintiff personally and informed him that he had violated Company policy by contacting the AHRC. (*Ouellette Decl.*, dated Feb. 2, 2011, ¶ 6.) Despite the warning, plaintiff returned to AHRC a few days later in an attempt to elicit information about AHRC's investigation. (*Id.*) As a result of these violations, the Company discharged plaintiff on May 19, 2008. (*Id.*) "Discharging an employee for violating company policies constitutes a legitimate and nondiscriminatory reason for terminating employment." *Renaud v. Federal Express Corp.*, No. 10 CV 4261 (LB), 2012 WL 34089, at *7 (E.D.N.Y. Jan. 6, 2012) (internal quotation marks and citations omitted); *cf. Satterfield v. United Parcel Service, Inc.,* No. 00 Civ. 7190, 2003 WL 22251314, at * 14 (S.D.N.Y. Sept. 30, 2003) (violations of Company policy and appearing in unauthorized work area constituted neutral, non-discriminatory reasons). Accordingly, the burden shifts back to plaintiff to demonstrate that defendants' reasons for his suspension and termination are nothing more than a pretext for discrimination.

### (3) Evidence of Pretext

Although plaintiff argues generally that his suspension was not warranted and provides his

version of the events that transpired on the bus on the day of the confrontational incident, plaintiff offers no evidence that defendants' reasons were pretextual to an unlawful animus, be it discriminatory or retaliatory. For purposes of plaintiff's burden, it is irrelevant whether plaintiff or Robinson were at fault during the confrontation incident underlying their suspension. *Cf. Rodriquez v. City of New York*, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008) ("evidence that the decision was . . . based on a faulty investigation" was insufficient to establish pretext) (citations omitted).

Plaintiff's offer of pretext based on an alleged disparity of treatment between plaintiff and Robinson is unavailing. It is undisputed that the Farmingdale terminal provided services only to AHRC and that AHRC directed that the Company to remove both employees from AHRC routes pending their investigation into complaints AHRC had received from some of the participants on board the bus that morning. (*Lawrence Decl.*, dated February 14, 2012, at ¶ 9.) It is also undisputed that both plaintiff and Robinson were suspended from employment at the Farmingdale terminal. (*Id*.) Without citing to any evidence, plaintiff asserts that Robinson was later given a reassignment, while plaintiff was not; however, plaintiff's deposition testimony reflects that the defendants' decision not to reassign work to plaintiff was based on his violation of Company policy:

Q:      What did you do after you went back to AHRC the second time?

A:      What did I do? I went to Bohemia to see Maureen.

        *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Q:      Maureen was there and you spoke to her?

A:      She told me "Paul, you messed up everything. I am just going to call you."

Q:      You are reading from Exhibit D?

A:      Yes, yes.

Q:      Do you remember any of this?

A:      Yes, I remember.  She said, "Paul, you just messed up everything.  I was just going to call you to go back to work and now you messed up everything.  You are not supposed to go to see Lisa Shartell.  That's policy."

(*Grath Aff.*, dated February 16, 2012, Ex. A at 110-11.)

Further, plaintiff's offer of pretext based on speculation that he was set-up by Robinson and the Company in retaliation for filing an administrative complaint fails.  Without citing to any evidence, plaintiff's counsel states "[u]pon information and belief, Ms. Robinson was instructed by their supervisor, Barbara Lawrence, to make" complaints about plaintiff. (Pl.'s Mem. in Opp. at 11).  However, plaintiff's personal belief is insufficient to satisfy his burden of pretext.  *See Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 130 (2d Cir. 1996) (pretext cannot be established by plaintiff's "personal belief," especially where "the facts . . . indicate" that defendant was not motivated by an unlawful animus).  Plaintiff's allegation that Robinson instructed passengers on the bus to complain about plaintiff is refuted by Robinson's sworn testimony.  (*Robinson Decl.*, dated February 14, 2012, at ¶ 6.)  To the extent plaintiff speculates that the complaints were contrived, plaintiff's own testimony acknowledging that there were clients who had yelled and screamed during the incident provides a conceivable basis for the complaints:

Q:      You tried to avoid an accident?

A:      Yes.  So after I apply my brake very hard, you know – and when I did that, I guess Mrs. Margaret was – she told me, I don't know, but she said at least she was – she almost fell down.  That's what she said.  When I tried to avoid the accident, the clients – you know, they yell.  They scream.  They think something happened, but thank God I didn't hit that car.  It would have been my fault if I hit that car because I am going to turn.

          *     *     *     *     *     *     *     *     *     *     *     *     *     *     *     *     *

Q:      So you slammed on the brakes and the participants were yelling.

A:      Yes, yelling.

Q:      Then what happened?

A:      When I looked out the window to see whatever I see, I see Mrs. Margaret almost
         fell down, you know– she leans on this, on the seat.

Q.      Okay.

A.      Right away, she came on me and she slapped my face with her finger like that
         (indicating).  She say if I cause her to get hurt, she is going to hurt me back.

         *    *    *    *    *    *    *    *    *    *    *    *    *    *    *
Q:      That was the end of it?

A:      That was the end of it.

Q:      You called the dispatcher and told her what happened and she said to finish the
         route?

A:      Yes.

(*Grath Aff.*, dated February 16, 2012, Ex. A at 92-96.)

In short, plaintiff has offered no evidence of pretext other than his own beliefs and

speculations, which, standing alone, are insufficient.  *See, e.g., Goenaga,* 51 F.3d at 18 (plaintiff

cannot rely on merely conclusory factual allegations to survive summary judgment).  In short,

given the record of a legitimate, non-retaliatory reasons for plaintiff's suspension, which plaintiff

does not refute with admissible evidence, a reasonable trier of fact could not find that his

suspension was the product of a retaliatory or discriminatory animus.

In addition, plaintiff has failed to offer any evidence from which a reasonable jury could

infer that defendants' decision to terminate plaintiff for violating Company policy was a pretext

for retaliatory animus.  The only evidence plaintiff offers to support his claim of retaliation is his

disagreement with defendants that his employment conduct was inappropriate (stating that

because defendants ignored his request for information concerning the investigation he approached the investigator at AHRC himself) or he violated any Company policy. *Niagra Mohawk Power Corp. v. Jones Chemical, Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) ("[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact"); *see Schupbach v. Shinseki,* No. 09-cv-3513 (JFB)(AKT), 2012 WL 3638791, at *13 (E.D.N.Y. Aug. 23, 2012) (holding "[a] plaintiff cannot simply substitute utter speculation for the competent proof that would be necessary to permit rational inferences by a jury of discrimination or retaliation"). "[I]t is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." *Kalra v. HSBC Bank USA, N.A.,* 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008); *see Renaud,* 2012 WL 34089, at *8 ("[a]lthough plaintiff argues that his termination was not warranted, plaintiff must show that defendant's proffered reasons are pretext for discrimination, not that they are unfair or incorrect"). While plaintiff may not agree with the reasons for his suspension or termination, the "general rule" is that "an employer can suspend or discharge an employee at will for any reason, wise or unwise, fair or unfair, as long as this decision is not based on discrimination." *Baldwin*, 470 F. Supp. 2d at 233. Because plaintiff relies on pure speculation and has not produced sufficient evidence to support a rational finding that defendants' reason for his termination was pretextual or that his race, national origin or protected activity was a substantial reason for his termination, plaintiff is unable to satisfy his burden that defendants' reason is a pretext for discrimination or retaliation. *See Vanhorne v. New York City Transit Auth.*, 273 F. Supp. 2d 209, 214 (E.D.N.Y. 2003) (a plaintiff's conclusory assumptions as to the reason for an employment decision is insufficient to support an inference of

discrimination). In sum, given the record of a legitimate, non-retaliatory reason for plaintiff's termination, which plaintiff does not refute with admissible evidence, a reasonable fact finder could not conclude that defendants' basis for termination was pretextual. Accordingly, defendants' motion for summary judgment on plaintiff's retaliation claims is granted.[6]

## IV.  Plaintiff's Discovery Request

In her Affirmation in Opposition to Defendants' Motion for Summary Judgment, plaintiff's counsel requests that (1) discovery be re-opened, stating that "[a]s the Court will see from its review of the parties' submission, this case and the interests of justice cry out for additional discovery," and (2) the summary judgment motion "be denied without filing until such time as plaintiff has had the opportunity to conduct additional discovery." (*Heuser Aff.*, dated January 12, 2012, ¶ 2.) Under Fed. R. Civ. P. 56(d)(2), where "a non-movant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery." However, such relief would not be appropriate in this case. Following plaintiff's counsel's appearance in this case on behalf of plaintiff, the undersigned granted two extensions of the discovery deadlines.

---

[6]Although plaintiff's complaint does not assert a cause of action under the New York State Human Rights Law and his papers in opposition do not reference a state claim, he has attached copies of his administrative complaints brought under the New York State Executive Law based on race, national origin and in retaliation for engaging in protected activity. Employment discrimination claims brought under the New York State Executive Law are analytically identical to discrimination claims brought under Title VII. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708 (2d Cir. 1996); *see also Dorcely v. Wyandanch Union Free Sch. Dist.,* 665 F. Supp. 2d 178, 218-19 (E.D.N.Y. 2009) (same); *Potenza v. West Irondequoit Central Sch. Dist.*, No. 06-CV-6407, 2009 WL 2876204, at * 11 (W.D.N.Y. Sept. 2, 2009) (same); *Brennan v. City of White Plains*, 67 F. Supp. 2d 362, 371-72 (S.D.N.Y. 1999) (noting the legal standards governing claims under Section 1983 and Title VII are the same as the New York Human Rights Law). For the reasons stated above, because the court would apply the same standard and analysis to any state law claims at issue, such claims would not survive summary judgment.

Plaintiff's counsel's request now comes one year after the undersigned closed discovery in this case, and she provides no "specified reasons" regarding why she could not have raised this matter earlier, why the defendants' prior discovery responses were inadequate, or what she believes further discovery will show. *See Guray v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999) ("[A] party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts."). Accordingly, plaintiff's requests are denied.

## CONCLUSION

For the foregoing reasons, defendants' summary judgement motion is GRANTED. The Clerk of Court is directed to enter judgment and close the case.

**SO ORDERED.**

Dated: Central Islip, N.Y.
       September 19, 2012

_____/s_____
ARLENE ROSARIO LINDSAY
United States Magistrate Judge